Case 17-1551, Ralph Pelton v. Alex Perdue, et al. Oral argument not to exceed 15 minutes per side. Mr. Curlew for the appellants. Good morning to the panel. Douglas Curlew on behalf of Officers Perdue and Pfeiffer. I would like to reserve five minutes for rebuttal, hoping that I don't use it. I want to call the court's attention first to a case that was decided by the U.S. Supreme Court on Monday. The opinion was issued January 22, 2018. It's District of Columbia v. Westby. There's two points made in that opinion that I think are apropos for this particular case. Do you have copies of that opinion? I do not, I'm sorry. It is on the Supreme Court's website. What's the style of the case again? District of Columbia v. Westby. Okay, thank you. The case number in the Supreme Court is 151485, and it was decided Monday. And have you advised opposing counsel of your... I just discovered it myself. Basically the two points to be drawn from it, because it's not specifically factually on point with this case. It was the arrest of people at a vacant building having a party. But they make two points. One is that in the situation of an arrest, or as in this case, a Terry stop, an investigation, you have to look at the totality of the circumstances. They reiterate that, and of course that's a familiar principle, rather than individual facts. And I think in this case there's been a tendency for the appellee, Mr. Pelton, to look at individual facts. The dogs, the cars out front, the light on the porch. You need to look at the totality of the circumstances. And I think in our brief, when I was writing my argument, I said, you know I already said everything in my reply brief. I don't know why I'm rewriting it in my argument notes. But we need to focus on the overall picture. If any case cries out for a de novo review, it's this one. The comment by the district court judge is inexplicable. I want to get it right. They weren't looking for anyone that had brandished a gun? That's exactly what these officers were looking for. Now they went to the wrong house. They had the wrong people. But the circumstances that they had gave every appearance in the exigency of the situation, where they had to respond to a life-threatening situation. And there's no denial that there was a life-threatening situation at another house nearby. They had to make a decision. Both officers said, we intended to confirm the address, to confirm the house with the caller before we went in. This is an identified informant, Arturo Cooper. Isn't that where the individual data points that you spoke about do matter? Because there is a list of items that identified the home. And it seems to me that the totality of the circumstance would be saying, when you walk up to that place, what is the indication that you are confirmed in the right location? And those individual data points matter to that. You know, what kind of cars were in the driveway? Was it what was described by Mr. Arturo, I believe? Or was it the singular van that was a different color? Were there dogs about the location? Did the gentleman have a hat of a certain color on? And I guess what I'm struggling with is when the answer to the connection between what you've been told and all of those data points are missing from the location at which the police officers arrived, at what point do they need to evaluate or reevaluate their impression that that's the right spot? There's two responses to that. First, the time for reevaluation was cut short on the officers because suddenly they were confronted by the woman and the man that came out of the house to them, Rose Thompson and Ralph Pelton. But doesn't that also matter? Because the report was that a man is holding a woman with a gun to her head. And when they drive up, there's the woman standing on the front porch. That's right. But the question is who turns out to be a somewhat angry woman followed by an obviously angry man. And as Officer Piper pointed out, this is kind of what one expects to encounter in a domestic violence situation, and there's often resistance from the victim in that circumstance. And so that wasn't anything that would dissuade or dispel his suspicions. Why isn't part of the totality of this circumstance that they could have and absolutely did not answer the old guy's question about why were they there? They were focused on trying to get the man and the woman separated and make sure that neither of them, especially the man, was in fact the guy with the gun. Remember, there had been a report of a gun. There's no question that the existence of a gun at another location in that neighborhood is undisputed. And their focus was on we've got to find out if there's this gun here. Could they have given an explanation? I suppose sure they could have, but they weren't looking to give explanations. They were looking to get everybody in place and under control. And is that the best technique? You can debate that after the fact. We can debate that long. Officers at the time don't have the opportunity for debate. They just want to get safety control. As Pfeiffer pointed out, if he had just stopped and answered a question, we could have patted him down and dispelled this. The whole point of the Terry decision— Well, help me. If Mr. Pelton had stopped and answered the question, or if the officers had stopped and answered the simple question, first from the woman, why are you here? And then from the man, why are you here? Could they have done that? I suppose so. But that wasn't their focus. I think the question is should they have done that? I don't know why they should have, because you can debate back and forth whether they should or should not. But the question was had the two people simply stopped in response to the officer saying, please put your hands up and let us clarify what the situation is. That was their focus. That was the focus they chose to have. And I think it's reasonable, a reasonable choice among the alternatives, given the gun situation. He did drop the TV remote. The TV remote, yes. Now, you had mentioned the various factors, the dogs, the hat. The situation with those is that they're all transitory items. The dogs, of course, they said they're dogs outside. But Arturo Cooper said they're taking the dogs inside. So there was no expectation there would still be dogs outside at the time. A hat is easily taken off. The porch light, it was a question of perspective. Arturo Cooper said, I see a light on. Well, how do we know? Can you see that from the front of your house? Arturo, what window are you at? He's back in his bedroom. So all these were transitory things. The important circumstances was we've gone to a call in of a domestic dispute with a gun. We encounter, rushing out to us, before we can talk to Cooper and confirm where we're at, before we can do any looking around. Counsel, I'm sorry to interrupt. Sure. We've heard a recitation of what Mr. Cooper said to the dispatcher. I'm not clear from your brief and your opposing counsel's brief. What did the officers know of those items that Mr. Cooper related? Did they hear everything from the 911 call? I can't be absolutely certain. I had the same question as I was reading through materials. Did they absolutely hear everything? In his deposition, Perdue said that he pretty much had heard each of the things as counsel through them questioning him. So for the purpose of the argument, I'm kind of making the assumption that they heard all those things. The dispatcher was talking. And I think, but again, all the things were transitory, so it doesn't change the ultimate result. The other thing, as far as the angry woman and the angry man coming out of the house being the first thing they encounter and suddenly, as Pfeiffer said, I've got to give my attention to what I'm being confronted with. That new case from the Supreme Court also says, reminds us, and this has been said before, but reminds us that officers can make common sense inferences based on their experience. Pfeiffer and Perdue especially had testified that he'd been in a situation where a domestic violence dispute had exploded into violence when the police were there. And so the officers can make the common sense inference from their experience that if I go to a house where there's been a report of domestic violence and I find an angry woman, supposedly the victim, but still angry, that's not unusual. And if I find the angry man, that's also not unusual. I've encountered an angry woman or an angry man where I think there's been a domestic violence incident. That's really, in my common sense inference based on my experience, this is pretty much what I expect to find. All these other transitory factors, I mean, they're interesting to think about, but I've already found confronting me the exact thing that I expect to find at this site. And, you know, if they had answered the questions, there wouldn't have been any kind, or at least just stopped and put their hands up like they were told repeatedly five times from Perdue to Thompson and then again from Pfeiffer to Pelton. When opposing counsel talked with our settlement office here? I don't know if we did or not. I usually, the trial attorney handles those. He's right for settlement. But I don't know if that happened or not. I see my time is up. If the panel has no questions, I'll sit. I think we do not. Thank you, counsel. Thank you very much. Good morning, everyone. Stephanie Arndt here on behalf of the appellee today. To answer your question, Judge Norris, there was the mediation process through the six years. I don't want to know what happened. No, I understand. I just wanted to answer your question since I was part of it. And then I also wanted to discuss some of the issues that were just raised. The first thing I'd like to discuss is Defendant Pfeiffer's quote at page 51 of his deposition. We did not have time to figure out which house was 190 Reed. That was the only point of reference that they had was 190 Reed. Now, both parties have attached the dash cam. You can see as they come in to the park, they get right out of their car. There's no effort by them to try to determine, to try to drive down Reed Street. They're not even on Reed Street. They're on Elkington when they come in. There's no effort by them to drive down Reed Street and try to figure out which house is Mr. Cooper's so that they have a point of reference. Or there's no chatter that you can hear where they're trying to, through the dispatcher, communicate with Mr. Cooper to determine that they have an appropriate point of reference. Now, opposing counsel has also mentioned these transitory items or that these data points are transitory. Well, I'd like to just in part answer your question and also address that. What did these officers know at what point? When we watch the dash cam, we know that as they are driving lights and sirens towards the park, they are told about a man in a white hat, that the house is to the right of 190 Reed, that there are dogs on the premises, and actually you'll see, or I'm sure you've watched it, but if you haven't already, as they're driving into the entrance of the park is when they're told that there are dogs on the premises and that this man is trying to bring the dogs into the house. When their vehicle is parked, you then hear a reference to the white truck in the green car. So his claim that, well, the white truck in the green car could have moved, that's just not even, that's disingenuous. I mean, they're told about that while they're in the park. You can see it on the video. Also, he makes a statement, well, the man and the woman, they're very angry. Well, they come out, they're audibly confused. As you had mentioned, Judge Francis, they're like, why are you here? What are you doing here? They only become angry once the woman, who's only wearing a nightgown, is ordered down into her front yard. And the man, who has a submachine gun pointed at his head. What's this submachine gun thing? Is it a J. Edgar Hoover Tommy gun or something? My husband has a gun, and he tried to explain to me it's somewhat like an assault rifle, like an AR-15. So it's an automatic rifle? Yeah, it's scary. And she comes out of her house, and this is pointed at her head. And even Perdue said in his deposition, given everything that happened that night, her reaction to what she came out to was understandable. And then Mr. Pelton comes out, his girlfriend in her nightgown is being dragged down the porch, and he's got a submachine gun pointed at his head. I mean, there's nothing in this record. I mean, candidly, 1983 actions are something relatively new to me. I am generally a personal injury malpractice appellate lawyer. I'm learning in this area. But the focus in all the jurisprudence seems to be reasonableness. Was the officer's actions reasonable under the circumstances? These officers knew nothing. They had absolutely no basis upon which to believe that this was the house of the domestic violence incident. It was a tan trailer. They saw a man and a woman looking out the window at them. I mean, that's some reason, isn't it? No. I mean, respectfully, Your Honor, it's a trailer park with police cars. Everybody was probably looking out their window. And actually, when you're listening to the dash cam, I didn't hear it the first few times, but apparently I have better speakers on my laptop. When you're listening to it, you actually hear a point where he tells somebody else to go back in their house before you then hear the altercation ensue with the Pelton home. So especially when they're right down the street from your house, it's totally reasonable that you're going to be curious, especially in this case where Megan Thompson had been coming home from work, and she was walking into the house, which is another fact that's different from what they were told. There's a woman walking into the house, Megan Thompson, instead of a man with dogs walking into the house. There's no sound of dogs anywhere. Mr. Pelton doesn't own a dog. So when you ask, was their stop reasonable, was there reasonable suspicion? No, there wasn't. And was there reasonable suspicion for them to then tackle him? No. They had no reason to believe that this was the house of the domestic violence incident. They didn't. Counsel argues that this is different from the execution of a warrant or other kinds of cases where the police get to choose the time at which they come, that this is an emergency situation and they think someone may be killed. Doesn't that play into the totality of the circumstances? It may be a factor, but the case that he was talking about that I believe that I had cited in my brief was the Pratt case, and that was a raid. The court was very specific to note that that also involved a situation where it was, like, 8 o'clock at night, it was darker, and it was a raid and it was a duplex. And so, you know, there's two doors at the front. They accidentally went into the wrong door. And in that case, the court said under those circumstances, maybe going into the wrong door was a topic of qualified immunity, but once you've gotten there, you surely knew that this was not a dope house, and therefore your actions of excessive force thereafter are not protected by qualified immunity. So it's slightly different, and it is part of the totality analysis, but, I mean, when you look at the case law that he's responding to that I cited, it's a raid too, and those are also very high stressful situations. I mean, police work by its very genesis is stressful situations, but that's why these officers are taught the techniques that they're taught, and they're also taught, and the case law requires them to continually assess the situation and be mindful of the fact that you have to be running these things through your head. You have submachine guns pointed at people. You know, you can hear on the audio they're terrified. There are little children in this house. They are just absolutely terrified, and part of your obligation as a law enforcement officer is to make sure that you are at the right place at the right time, and you have to do that by establishing facts. They didn't have to get out of that car at that point when they did. They could have easily called back to dispatch and tried to confirm which house was Mr. Cooper's so that they could then look to the right. Then they would have seen the back porch light on at the Newberry address. There was no trailer blocking it. It was open. I think it was like two or three open lots, so that would have been visible to them, the back trailer light. That's not in the record, is it? That there were open lots in between? I don't remember reading that. I don't. I think that there was a discussion during one of the depositions that if you look between, the Newberry house was visible as being between. I think that was discussed in Mr. Pelton's deposition. But no, the number of empty lots I don't believe was discussed. But the fact that it was to the right and it could be visualized from Mr. Cooper's house, and they might have even made contact with Mr. Cooper. He was still on the phone with them. I think that the trial court got the decision right in this case, and I think that that decision needs to be affirmed. Unless the panel has any other questions, I would rest on my brief. We do not. Thank you, Kelly. Thank you very much. I would just say this. In the circumstance where you've got a situation to call a gun to a woman's head and you've already had the time to drive to the scene, there really isn't a lot of time to make a lot of debate. That's why we have qualified immunity, because officers have to make decisions. Here's the problem for me. If they've gotten this call and they think a woman is near that area with a gun to her head, isn't the most important thing that they can do is figure out where that woman and that gun is, not just choose? There's record information about getting confused once they drove in. By stopping at a place that wasn't the right place, that woman could die. So isn't the most important thing they need to do is ascertain, talk to, I think it's Arturo. Am I mispronouncing the name? Arturo Cooper. Or the person who is on the radio with them, and make sure they don't waste time at the wrong spot. They got there and their first impetus was to get out of the car and get to the house. It was to the right of Cooper's address. There's no question they were to the right. They were at the wrong house to the right. It turns out the correct house was actually not only to the right of Cooper's house, but slightly behind. Trailer park or mobile home communities are pretty tight and a little, it's not always that easy to know where you're at. Their impetus at the time was we've got a woman with a gun to her head. And I'm sure that woman at that other house was eager to be aided as quickly as possible. And they just made the choice to rush to the scene. And as they get out of the car, there's the people that looks like they maybe should be at the right place, and they've got to check. Judge Cone didn't address the claim against, I guess it's Lieutenant Perdue. That's correct. So what are we supposed to do about that? Send it back for his determination there? Denial of immunity is de novo review. This court can make its own decision about Officer Perdue based on the record placed to it. That's what, there's a lot of discussion in the brief because it wasn't discussed by the court, but I certainly point that out. If the court has no further questions, I'll be done. I think we do not. Thank you, counsel. Thank you very much. The case will be submitted. Court may call the next case.